UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DONNA WITSELL and CHARLES
WITSELL,

    Plaintiffs,

v.                                                CASE NO: 8:11-cv-781-T-23AEP

SCHOOL BOARD OF
HILLSBOROUGH COUNTY,
FLORIDA,

    Defendant.
_____/

**<u>ORDER</u>**

After a teacher observed shallow cuts on the thigh of the plaintiffs' thirteen-year-old daughter, H.S.W., the school ordered H.S.W. to mental-health counseling. The observation and the counseling occurred on Friday. The school informed neither parent of H.S.W.'s cuts, her counseling, or her suicidal ideation. On Saturday H.S.W. committed suicide in her parents' home. The parents sue (Doc. 1) under 28 U.S.C. § 1983 and under state law on behalf of themselves and the estate of H.S.W. The parents allege negligence and a violation of both the parents' and H.S.W.'s substantive due process right under the Fourteenth Amendment of the United States Constitution. A June 20, 2011, order (Doc. 18) dismisses each Fourteenth Amendment claim, and the parents amend (Doc. 25) the complaint. The School

Board moves (Doc. 30) to dismiss each Fourteenth Amendment claim, and the parents respond (Doc. 35) in opposition.

## Allegations of the Amended Complaint (Doc. 25)

The plaintiffs, Donna and Charles Witsell, live in Hillsborough County, Florida. The Witsells' thirteen-year-old daughter, H.S.W., attended a middle school in Ruskin, Florida. On Friday, September 11, 2009, after observing shallow cuts on H.S.W.'s thigh, a teacher ordered H.S.W. to report to the principal's office. Both the teacher and the principal knew that H.S.W. suffered harassment from other students.

During the afternoon of September 11, 2009, a school social worker, Jody Orlando, provided H.S.W. "involuntary mental health counseling." (¶ 11) The counseling was H.S.W.'s first encounter with both Orlando and mental health counseling. Orlando counseled H.S.W. alone and without assistance. For the first time, H.S.W. disclosed her suicidal ideation. After the counseling session, Orlando failed to notify the Witsells of either the mental health counseling or the shallow cuts on H.S.W.'s thigh or "the need for continued care." (¶ 14)

The following day, Saturday, September 12, 2009, H.S.W. committed suicide in her bedroom at the Witsell residence. The Witsells discovered in H.S.W.'s bedroom a "no-harm contract" (Doc. 8-1), which provides:

**No-Harm Contract**

I, [H.S.W.], hereby agree that I will not harm myself in any way, attempt suicide, or die by suicide.

> Furthermore, I agree that I will take the following steps following actions [sic] if I am ever suicidal:
>
>> 1) I will remind myself that I can never, under any circumstances, harm myself in any way, attempt suicide, or die by suicide.
>>
>> 2) I will call 911 if I belive that I am in immediate danger of harming myself.
>>
>> 3) I will call any or all of the following numbers if I am not in immediate danger of harming myself but have suicidal thoughts:
>>
>> Name: [Ms. Orlando], Phone #: [766-XXXX], Address: _____
>>
>> Name: _____, Phone #: _____, Address: _____
>>
>> 4) If I do not reach anyone at those numbers I will call [the community services hotline at] 813-234-1234.
>
> Signature of Student: [H.S.W.] Signature of Counselor: [Ms. Orlando]
>
> Date and Time: _____

(Doc. 8-1)[1]

After a 2007 "Youth Risk Behavior Survey," which suggests that almost fifteen percent of high school students "considered" suicide, the School Board declared in School Board Bylaw 5350 (Doc. 30-7) "the paramount importance" of the safety of students. (Doc. 25 at ¶¶ 19 and 20) School Board Bylaw 1030 (Doc. 30-2) requires the superintendent to train employees on, and supervise compliance with, official School Board policy. (¶ 25)

---

[1]The School Board attaches each document alleged by the Witsells. Central to the claims and undisputed, each document is properly considered in resolving the motion to dismiss. *Ware v. Polk County Bd. of Comm'rs*, 394 F. App'x 606, 608 (11th Cir. 2010) (quoting *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005)).

Under the School Board's organizational bylaws, the superintendent and Department of Psychological Services established the "Protocols and Guidelines for Suicide Prevention" (Doc. 9-1) and the "Handbook of Suicide Prevention, Assessment, and Follow-Up Procedures and Documentation" (Docs. 9-2, 9-3). (¶ 23) Among other responsibilities, the two manuals collectively assign the superintendent, the Department of Psychological Services, and each school principal to establish a suicide "crisis team" and to ensure a mental health review of each suicidal student. (¶ 38) Additionally, the School Board's ninety-page Handbook (Doc. 9-2, at 6) provides, "[w]hen mental health professionals become aware of a student's report of suicidal ideation or plans, the professional becomes legally responsible for initiating a series of communications to protect the student." (¶ 37) The Witsells allege "[o]n information and belief[] formed in the absence of any public records to the contrary" that despite the bylaws the School Board failed to (1) provide suicide prevention training to the middle school faculty, (2) supervise psychological services of schools and mental health professionals, (3) establish "school-based crisis teams," and (4) evaluate the Department of Psychological Services. (¶ 39)

Additionally, School Board Bylaws 1220, 3220, and 4220 charge an employee's immediate supervisor with performance evaluation. On Orlando's next performance evaluation after the suicide, the principal of the middle school scored Orlando as "outstanding." (¶ 48) On March 22, 2010, "after some four months of additional public scrutiny," an evaluation by the School Board's Department of Student Support

Services found Orlando to "need improvement." (¶ 49)  Orlando responded in writing, "The protocol for 'self-injury' was followed to the best of [my] knowledge.  This [finding of needs improvement] is discriminatory since the cited standards had at that time not been consistently enforced.  There also had not been an adequate amount of training on said area of concern."  (¶ 50) (brackets in amended complaint)

In the Section 1983 claim, the Witsells allege (1) that the School Board accepted a constitutional duty for H.S.W.'s care and protection when the school arranged mental health counseling, (2) that the School Board maintained an inadequate and unconstitutional policy for the protection of minors, and (3) that the School Board, through the positive evaluations by the principal and the Department of Student Support Services, ratified Orlando's errors.

## Discussion

If suing a local government under Section 1983, a plaintiff must prove a constitutional violation caused by the government.  *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 568 (11th Cir. 1997) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)); *G.C. v. School Bd. of Seminole County, Florida*, 639 F. Supp. 2d 1295, 1307 (M.D. Fla. 2009) (Antoon II, J.) ("To impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.").

The Due Process Clause of the Fourteenth Amendment states "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Nothing in the Due Process Clause requires the State to protect a citizen's right to life, liberty, and property against infringement by a private actor. *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 195 (1989). Thus, a state's failure to provide protection against private violence is not a constitutional violation. *DeShaney*, 489 U.S. at 195.

In *DeShaney*, a three-year-old visited the hospital for injuries strongly suggestive of child abuse. After learning of the injuries, the county obtained from a juvenile court an emergency order that placed the child in the custody of a county hospital. After determining that the evidence of abuse was insufficient to justify continuing custody of the child, the county returned the child to the father. While visiting the home throughout the following months, a county social worker assigned to monitor the child's case often observed evidence of abuse, including a number of suspicious injuries. The social worker recorded the observations, but the county, failing to act, left the child in the father's home. The child again visited the hospital for suspicious injuries, but the county again failed to act. Four months later the father beat the child into a life-threatening coma and caused severe brain damage.

Rejecting the Due Process claim against the county, *DeShaney* holds that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which

the government itself may not deprive the individual." 489 U.S. at 195. *DeShaney* notes two exceptions. First, an affirmative duty to provide for "reasonable safety" arises if the state creates a "custodial relationship":

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200. Second, an affirmative duty arises if the state renders the person "more vulnerable to harm":

> [A "custodial relationship"] analysis simply has no applicability in the present case. Petitioners concede that the harms [the child] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the child].

*DeShaney*, 489 U.S. at 201. Thus, a school board may acquire a duty by establishing a "custodial relationship," *i.e.*, by restraining either through incarceration, institutionalization, or a similar restraint an individual's freedom to act on his own behalf. *Wyke*, 129 F.3d at 569 (quoting *DeShaney*, 489 U.S. at 200). In the absence of

a "custodial relationship," a school board assumes a duty only by a wrongful act that renders the student more vulnerable to harm, *i.e.*, a wrongful act that creates or enhances the danger of a constitutional deprivation. *Wyke*, 129 F.3d at 567 (citing *DeShaney*, 489 U.S. at 1006); *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996)).

Applying *DeShaney*'s principles, *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560 (11th Cir. 1997), holds that a school board typically owes no constitutional duty to protect a student from self-inflicted harm that occurs outside of school. 129 F.3d at 565. In *Wyke*, a student first attempted suicide in the boys' restroom at school. A classmate intervened and persuaded the student to return to class. The classmate described the incident to his mother, who informed the dean of students. The dean assured the classmate's mother that he "would take care of it." Shortly thereafter, the dean sequestered the student in the dean's office and read Bible verses to the student. Later, the student again attempted suicide at the school, but the attempt was foiled by a janitor, who immediately reported the attempt to the school's assistant principal. Neither the dean nor the assistant principal notified the student's parents of either the suicide attempts or the sequestration. Within two days after the second attempt, the student committed suicide at home.

On a motion for judgment as a matter of law, the district court dismissed the Section 1983 claims. The Eleventh Circuit affirmed. First, the Wykes argued that the school had a "custodial relationship" with the student because of the school's

- 8 -

custody of the student under Florida's compulsory school-attendance laws. However, *Wyke* rejects school attendance as a sufficient "restraint on liberty" and holds that compulsory school-attendance laws create no duty to protect. 129 F.3d at 569 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) (noting that a school lacks the requisite custody over a student to create a constitutional duty to protect)); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *Maldonado v. Josey*, 975 F.2d 727, 732-33 (10th Cir. 1992); *D.R. v. Middle Bucks Area Voc. Tech. Sch.*, 972 F.2d 1364, 1371-73 (3d Cir. 1992); *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990); *Russell v. Fannin County Sch. Dist.*, 784 F. Supp. 1576 (N.D. Ga. 1992)); *Sanford*, 456 at 304 n.4.

Second, the Wykes argued that school officials "affirmatively prevented" the student's mother from saving the student's life – that, if the dean had not assumed responsibility for the student and told the classmate's mother that he "would take care of it," the classmate's mother would have told the student's mother, who would have prevented the suicide. Rejecting the argument, the Eleventh Circuit observes, first, that the dean's sequestration of the student created no danger to the student, and second, that the dean's assurance that he would "take care of it" imposed neither on the classmate's mother nor on the student a limitation that rendered the student more vulnerable to harm:

> It was not [the dean], however, that prevented [the classmate's mother] from calling Wyke. [The classmate's mother] herself chose not to call Wyke. [The dean] did not, either by verbal or physical act, restrain [the

> classmate's mother] from picking up her telephone. [The classmate's mother] simply assumed that after speaking with [the dean], she did not need to. Wyke cannot recharacterize that decision, which was made by a private person under no obligation to act, as the school's decision to prevent Wyke or anyone else from helping [the student].

129 F.3d at 569-70; *see also Sanford v. Stiles*, 456 F.3d 298 (3d Cir. 2006) (holding that a student who committed suicide at home was not more vulnerable to harm despite the school's counseling and failure to inform the student's parents of the suicidal ideation).

The Witsells imply that the twenty-minute counseling session creates a "restraint on liberty" sufficient to impose a constitutional duty through a "custodial relationship." However, H.S.W. committed suicide on a Saturday, while in her parents' home and while in her parents' custody. As in *DeShaney*, H.S.W. was neither incarcerated, institutionalized, nor likewise restrained by the School Board when the suicide occurred. As in *Wyke* and *DeShaney*, the duty that results from a "custodial relationship" "simply has no applicability in the present case." *DeShaney*, 489 U.S. at 201.

Similarly, other circuits hold that a school lacks a "custodial relationship" when a student commits suicide at home. For example, in *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1261 (10th Cir. 1998), a school official drove a suspended special-education student home during the middle of the day. Despite the student's two threats of suicide in the previous months (one on the day of the suspension) and despite the school's knowledge that the student had access to firearms in the home,

the school notified neither parent of either the child's suspension or the child's early return to the home. Before his parents arrived home, the student killed himself with a rifle. Rejecting a "custodial relationship," the Tenth Circuit states:

> At most, [the student] was a student in a public school confined in [the school official's] car during the drive home from school. Even if such circumstances constituted a custodial relationship, that relationship ended once [the student] exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official. . . . The fact that [the student] ended his life after he was "released" by [the school official] bars any liability under the special relationship doctrine.

*Armijo*, 159 F.3d at 1261; *see also Sanford*, 456 F.3d at 304 n.4.

Nonetheless, the Witsells argue that the "no-harm contract" effected a continuing "custodial relationship" with the school. However, even while supervising a student during the school day, absent some unidentified, abnormal, and peculiar restraint on liberty, a school lacks a "custodial relationship" with a student. *See Wyke*, 129 F.3d at 569; *Hasenfus v. LaJeunesse*, 175 F.3d 68, 73 (1st Cir. 1999) (affirming the dismissal of a Section 1983 claim after a fourteen-year-old student's attempted suicide at school); *Sanford*, 456 F.3d at 304 n.4 ("[N]o special relationship exists between school children and the state. This is because parents decide where their children's education will take place, because school children 'remain resident in their homes,' and because 'the child is not physically restrained from leaving school during school hours.'" (quoting *Middle Bucks*, 972 F.2d at 1371-73)). Similar to everyday studying in the classroom, everyday exercising on the playground, and everyday socializing in the hall, a counseling session (unaccompanied by some other

extraordinary element of custody and control), similar to a stay in "detention" or a visit to the principal's office, is an everyday event in the modern school and not an extraordinary, controlling, and confining "custodial relationship." Also, the Witsells fail to identify any manner in which the "no-harm contract" "affirmatively act[ed] to restrain" (in a manner similar to arrest, incarceration, or institutionalization) H.S.W's freedom to act on her own behalf once she left school on Friday. *See White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999) (holding that a "custodial relationship" emanates from "incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves").

Nor did the school by a wrongful act render H.S.W. "more vulnerable to harm." The Witsells allege both that Orlando's failure to inform the Witsells of the suicide counseling and Orlando's creation of the "no-harm contract" rendered H.S.W. "more vulnerable to harm." The Witsells' response encapsulates the argument:

> H.S.W. was released to her own ineffective devices although she clearly shared her suicidal intentions, for the first time, with an adult who even went so far as to reinforce her trust and reliance with a written contract. This exclusive trust and opportunity to protect H.S.W. were squandered by not providing her with continuing care and safety, including the continuation of safety into [the Witsells'] home. H.S.W. then went home and, without detection from her parents and with the added assurance of having warned an adult, did exactly what she told [Orlando] she was going to do: she committed suicide. It would have been better if [the School Board] had not acted at all.

(Doc. 35, at 5) *DeShaney* and *Wyke* reject this argument. Similar to the dean in *Wyke*, Orlando counseled H.S.W. and urged her not to commit suicide; similar to the school in *Wyke*, the middle school released H.S.W. at the end of the school day; similar to the school officials in *Wyke*, neither Orlando nor the middle school's principal warned H.S.W.'s parents of the suicide counseling or suicidal intentions; and similar to *Wyke*, a warning to the parents might have prevented H.S.W.'s suicide. As in *Wyke*, the School Board neither affirmatively prevented intervention by a family member or friend nor imposed a limitation on H.S.W. that rendered her more vulnerable to harm. The complaint alleges no school action by which H.S.W. became more susceptible to suicide.

Attempting to circumvent *Wyke*, the Witsells cite *Armijo* and note that the Tenth Circuit affirmed the denial of the defendant's motion for summary judgment because of a finding that the defendant "created the danger." However, unlike *Wyke*, *Armijo* is neither a precedent binding in the Middle District of Florida nor a precedent persuasively analogous in this action. Unlike here, the *Armijo* school returned the suicidal student to the parents' empty home in the middle of the day; unlike here, the *Armijo* school knew that the student had access to firearms in the home; and unlike here, the student committed suicide at home, on a weekday, and during school hours. *Wyke*, and not *Armijo*, controls.

Only the "no-harm contract" arguably distinguishes this action from *Wyke*. Thus, the Witsells allege that the "no-harm contract" placed H.S.W. "in a worse

situation than if the [School Board] and its personnel had not acted at all." (Doc. 25, ¶¶ 30-32) However, neither the complaint nor any other paper offered by the Witsells plausibly identifies how the "no-harm contract" affirmatively enhanced the probability of H.S.W.'s suicide, affirmatively prevented intervention by a family member or friend, or affirmatively imposed a limitation on H.S.W. that rendered her more vulnerable to harm. The "no-harm contract" directs H.S.W. toward rejection of suicide as an option and offers H.S.W. sources of assistance in the event of a crisis; the "no-harm contract" precludes no helpful option and impedes no helpful person.

Finally, the Witsells argue that the School Board had an independent constitutional duty "to empower [the Witsells] with [knowledge of the potential suicide] and to otherwise ensure H.S.W.'s continuing safety through her ongoing supervision and care." (Doc. 25, ¶ 34) *Wyke* decisively rejects this argument. "[The plaintiff] argues that the school had an independent constitutional duty to notify her of her son's suicide attempts. . . . We decline to wade through the uncharted waters of substantive due process." 129 F.3d at 570. Failing to show a "custodial relationship" or an action rendering H.S.W. "more vulnerable to harm," the Witsells establish neither a constitutional duty owed by the School Board nor, consequently, a constitutional right violated by the School Board.[2]

---

[2]Additionally, the Witsells must show that the constitutional violation is attributable directly to the School Board by maintaining an unconstitutional policy or custom; no *respondeat superior* or vicarious liability attaches. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue."); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Ainsworth v. City of*
(continued...)

Conclusion

Central to this action are a school counselor, who fatefully overlooks a child's critical desperation, and parents, who on a Saturday tragically discover their beloved thirteen-year-old daughter dead in her bedroom and by her own hand — singular nightmare for family, school, and community. But, absent a "custodial relationship" or a wrongful action rendering a student "more vulnerable to harm," the Fourteenth Amendment imposes on the School Board no burden to insure against the grim but persistent prospect of a student's suicide.

For this reason, the motion (Doc. 30) is **GRANTED**, and **COUNTS I and II** are **DISMISSED WITH PREJUDICE** for failure to state a claim. Under 28 U.S.C. § 1367(c)(3), supplemental jurisdiction over the negligence claim is **DECLINED**. Section 1367(d) tolls any applicable limitation for thirty days. *Jinks v. Richland County, S.C.*, 538 U.S. 456, 459 (2003). Accordingly, this action is **DISMISSED** for

---

[2](...continued)
*Tampa*, No. 8:10-cv-293, 2010 WL 2220247, *3 (M.D. Fla. June 2, 2010). A "failure to train" creates an unconstitutional policy or custom if "the need for more or different training [is] so obvious, and the inadequacy [is] so likely to result in the violation of [a] constitutional right[]" that the failure to train amounts to a deliberate indifference to a constitutional right. *City of Canton*, 489 U.S. at 390.

The Witsells attempt to attribute liability directly to the School Board by alleging that the School Board established an unconstitutional custom or policy by failing to adequately train employees in suicide prevention. However, with the absence of a finding of a constitutional duty and, consequently, with the absence of a finding of a violation of a constitutional right, a discussion of the School Board's alleged deliberate indifference to an absent and hypothetical constitutional right proves awkward, irrelevant, and ultimately unnecessary. *See Wyke*, 129 F.3d at 569 (citing *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[I]nquiry into a government entity's custom or policy is relevant only when a constitutional deprivation has occurred.")).

lack of jurisdiction.  The Clerk is directed to (1) terminate any pending motion and (2) close the case.

ORDERED in Tampa, Florida, on March 5, 2012.

*Steven D. Merryday*
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE